UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**UNITED STATES OF AMERICA,**

v.  CRIMINAL NO. 2:19cr76

**MACHAVALLIA MUTULU SHAKUR,**

**Defendant.**

## OPINION

This matter comes before the court on the Defendant's Motion to Suppress ("Motion"), filed on January 10, 2020. ECF No. 38. The United States filed a Response on January 23, 2020. ECF No. 40. The Defendant did not file a Reply.

The court held a hearing on the Motion on March 6, 2020. The court heard testimony from Special Agent Michael Santare, formerly an Officer with the Norfolk Police Department.[1] The court reviewed several exhibits, including video footage with sound from Officer Santare's body camera. The court reserved ruling on the Motion, and allowed the parties to submit supplemental authorities. The Defendant and the United States filed supplemental memoranda on March 10, 2020. ECF Nos. 47, 48. For the reasons below, the court **GRANTS** the Motion.

---

[1] For clarity, the court will refer to him as Officer Santare when discussing the facts of the case. Since this encounter with the Defendant, Mr. Santare has become a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives in Bronx, New York, and is no longer employed with the Norfolk Police Department.

## I. Facts

Upon consideration of the evidence, including the court's review of video footage from Officer Santare's body camera as well as Officer Santare's testimony at the hearing, the court makes the following findings of fact. On January 17, 2018, at approximately 1:00 P.M., Officers Santare and Luketic of the Norfolk Police Department were patrolling on East Princess Anne Road in Norfolk, when they observed a BMW sedan with a broken third brake light. Officers Santare and Luketic initiated a traffic stop. Officer Santare approached the driver side window of the BMW, where the Defendant was seated in the driver's seat. The Defendant handed to Officer Santare a California identification card that had his current name, Machavallia Shakur. Officer Santare informed the Defendant that the car's upper middle brake light was out. Officer Santare also asked if there were any weapons or narcotics in the vehicle, and the Defendant said that there were not.[2] During this

---

[2] Officer Santare was an excellent witness, who was forthright and credible. He testified that the Defendant was "extremely polite and forthcoming" and that nothing led him to think the Defendant had a gun in the vehicle, but that he routinely asked the gun question in this location near a "gun violence initiative zone." However, he testified that there could be situations where he would not ask the question, such as with a "female driver" with "three screaming kids in the back." In that event, Officer Santare testified he would just "give her a warning out of the gate." These quotes are from the court's notes taken during the hearing. The testimony gave the court concern whether this case involved some type of "profiling," since the Defendant was an African American male driving an older model vehicle. This line of questioning was not pursued in any detail by the parties or argued by them at the

2

time, Officer Luketic was talking to the only passenger in the car, who was seated in the front passenger seat. The passenger told Officer Luketic that she was on her way to a meeting with her probation officer, and that she was on probation for "possession" and for driving without a license. At some point during the first few minutes of the encounter, two officers who were in the area pulled up to assist Officers Santare and Luketic.

Officer Santare returned to his patrol car and ran the Defendant's information through several law enforcement databases. The databases returned the name Gregory Felton in connection with the Social Security number and date of birth provided by the Defendant, as well as a number of prior felony convictions, including some involving firearms. The discrepancy in the name associated with the Defendant raised the officers' suspicions that he was attempting to conceal his identity. The officers questioned the Defendant about this discrepancy, and the Defendant said that he had changed his name in 1998. Officer Santare then asked the Defendant why he did not have a driver's license on him. The Defendant produced a Social Security card with his current name, Machavallia Shakur, on the card, and told Officer Santare that his license was suspended and that he needed to take a class to get it

---

hearing or in the briefs. Given the court's legal and factual findings herein granting the Motion to Suppress, the matter is not pursued further here.

restored. Officer Santare's testimony did not indicate that he was unsatisfied with this answer or otherwise found it to be not credible. In fact, Officer Santare seemed satisfied with the explanation, and testified that, at this point, he had decided not to pursue the traffic violations any further. Officer Santare further testified that he had no particular suspicion that there were guns in the car and no heightened concerns for his safety at this point.[3]

In any event, immediately following the Defendant's comments about his license suspension, Officer Santare began to question the Defendant about guns, even though he had asked the Defendant about weapons at the inception of the stop and received a negative response. Although the body camera audio is difficult to hear at times, the audible portions of the conversation are as follows:

| | |
|---|---|
| Ofc. Santare: | <u>Here's the deal man. I'm not really interested in that, ok? I'm interested in guns. Do you have any weapons in the vehicle?</u> |
| Defendant: | No. |
| Ofc. Santare: | Can we take a look to make sure? |
| Defendant: | Well this is my sister's car. |
| Ofc. Santare: | Ok. A quick check? |
| Defendant: | What would make you think I have a gun? |
| Ofc. Santare: | <u>I'm just trying to keep the bosses happy, that's all it is.</u> |

---

[3] See <u>supra</u> note 2 and accompanying text.

4

| | |
|---|---|
| Defendant: | I feel you on that. You're more than welcome to search me or whatever because I have no . . . nothing. |
| Ofc. Santare: | You said I can? |
| Defendant: | Yeah. |

Gov. Ex. S-3 (emphasis added).[4]

Officer Santare then told the Defendant to step out of the vehicle and began to pat him down. Officer Santare found two bundles of cash totaling about $700 and $900 in two separate pants pockets. As Officer Santare was finishing the search of the Defendant's person, the Defendant directed him to a pocket on the arm of the Defendant's jacket that Officer Santare had not searched. Officer Santare opened the pocket and pulled out an inhaler and a small bag with white powder, which Officer Santare suspected was drugs. Officer Santare testified that the Defendant was "surprised" by the bag and denied knowledge of what was in it; no field test was performed on the substance. The Defendant did admit that the inhaler was his. Officer Santare put the Defendant in handcuffs. Officers Santare and Luketic then began a search of the car.[5] The search uncovered pills and suspected illegal

---

[4] Officer Santare testified that the location of the traffic stop was just outside a "gun violence initiative zone," and that this fact accounted for his particular interest in inquiring further about, and searching for, weapons. But see supra note 2.

[5] At some point while Officer Santare was searching the Defendant, but prior to the search of the car, the passenger told

narcotics in the glove compartment and paneling of the car; a scale; a loaded gun inside of a nylon bag in the trunk; and a locked safe containing methamphetamine, also in the nylon bag in the trunk.

## II. Analysis

The Defendant challenges three aspects of the traffic stop and searches: the justification for the initial stop, the extension of the stop to question the Defendant about guns, and the search of the Defendant's car. The court addresses each in turn.

### A. Initial Traffic Stop

The Defendant first objects to the initial stop of the BMW, and argues that there was no reasonable, articulable suspicion to stop the car and initiate a traffic stop. Motion at 5.

Under well-established law, a traffic stop is legal, if it is justified by reasonable, articulable suspicion of a criminal offense or traffic violation. E.g., United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016). Officers Santare and Luketic had reasonable suspicion to execute the traffic stop because they observed the third brake light of the BMW out, in violation of Virginia's traffic laws. Under § 46.2-1003 of the Virginia Code, it is illegal for a vehicle to have a defective light or signal

---

one of the officers that there were drugs stored in the trunk, glovebox, and behind the radio of the car.

device.[6] Accordingly, there was reasonable, articulable suspicion to execute a traffic stop and pull the BMW over, and the initial traffic stop was lawful.

### B. Extension of the Stop and Consent to Search

The Defendant next argues that Officer Santare abandoned the purpose of the traffic stop when he told the Defendant, "I'm not really interested in [the traffic violations]. I'm interested in guns." Motion at 8. The Defendant further argues that, once the underlying justification for the stop was abandoned, any extension of the stop was unlawful. Id. The court agrees that there was an unlawful extension of the traffic stop. In doing so, the court finds that the tasks related to the purpose of the stop were completed by the time Officer Santare began talking about guns, and that this resulted in an extension of the seizure without a lawful justification.

### 1. Tasks Tied to the Traffic Infraction Were Completed

The scope of a traffic stop must be "carefully tailored to its underlying justification." Florida v. Royer, 460 U.S. 491, 500 (1983). A traffic stop must last "no longer than is necessary to

---

[6] Specifically, § 46.2-1003 states: "It shall be unlawful for any person to use or have as equipment on a motor vehicle operated on a highway any device or equipment mentioned in § 46.2-1002 which is defective or in unsafe condition." Section 46.2-1002 includes "lighting device[s]" and "signal device[s]." Violations of Title 46.2 of the Virginia Code are "traffic infractions," punishable by a fine as provided in the schedule for Class 4 misdemeanors. VA. CODE ANN. § 46.2-113.

7

effectuate the purpose of the stop," unless the officer develops reasonable, articulable suspicion of additional criminal conduct that requires further investigation. Id. At the same time, officers are permitted to ask questions and perform other tasks that go beyond the investigation and prosecution of the particular traffic violation. Rodriguez v. United States, 575 U.S. 348, 354 (2015). Activities such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are within the acceptable scope and duration of a traffic stop. Id. at 355. Brief questioning that is unrelated to the traffic infraction is likewise acceptable, as long as such questioning does not "measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009).[7] However, in Rodriguez, the Supreme Court clearly held that "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." 575 U.S. at 354. For that reason, even brief unrelated questioning may be unlawful, if it occurs after the point

---

[7] The Fourth Circuit has found that extending a traffic stop by a minute or two beyond the time necessary to deal with the underlying suspected infraction is reasonable. See United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010) (1 to 1.5 minutes to inquire about the purpose of travel); United States v. Guijon-Ortiz, 660 F.3d 757, 769 (4th Cir. 2011) ("a few minutes" to check immigration status). Notably, these cases involved additional checks or other activities conducted while the stop was in progress, not, as here, after its purpose was concluded.

at which the tasks underlying the traffic stop are completed and while the Defendant is still seized.[8]

Importantly for purposes of this case, the Fourth Circuit, in its most recent pronouncements on this subject, has distinguished between unrelated questioning that occurs "during the course of a traffic stop," and questioning that occurs after the point at which the "tasks tied to the traffic infraction are . . . completed." United States v. Bowman, 884 F.3d 200, 210 (4th Cir. 2018) (quoting Rodriguez, 575 U.S. at 354). In the latter case, once the tasks related to the traffic infraction are finished, the stop becomes an unlawful seizure if it is extended for even a "de minimis" amount of time. Bowman, 884 F.3d at 210.

In this case, the court finds that the tasks tied to the traffic infraction were completed by the time Officer Santare began discussing guns. In so finding, the court credits Officer Santare's testimony that, at that point, he had decided he would not arrest the Defendant or even issue a ticket for the traffic infractions, as it was not his or his colleagues' practice to issue tickets in such situations. This intention was definitively articulated during the traffic stop and can be heard on the video footage, when Officer Santare said he was no longer interested in the traffic violations, but rather was interested in guns. Moreover,

---

[8] See infra Part II.B.2 at 13-14.

9

Officer Santare testified that he had no heightened concern regarding potential weapons or the safety of himself or the other officers.[9] See Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (stating that officer safety concerns are a "legitimate and weighty" consideration justifying additional protective measures during a traffic stop). The evidence in the record, therefore, indicates that there were no uncompleted tasks related to the traffic violations, to officer safety concerns, or to any other area tied to the underlying justification for the stop.

The United States, in its Supplemental Response, argues that the tasks related to the infraction were not yet complete at this point, because Officer Santare testified that his practice was to tell an unlicensed driver to park the car and depart on foot.[10] ECF No. 48 at 1. The court finds that this was not a "task tied to the traffic infraction." The court is not aware of, and the United States has not pointed to, any legal authority requiring this

---

[9] In addition to Officer Santare's testimony that he did not assess the situation to be particularly dangerous, it is also significant that he already had asked the Defendant if there were weapons in the car at the beginning of the stop, and that the renewed questioning about guns came after Officer Santare had decided not to pursue the traffic violations any further and was preparing to end the stop.

[10] Notably, the United States does not appear to dispute the general principle that a de minimis extension of the stop after the tasks tied to the traffic infraction are completed would be unlawful. Rather, the Government argues that, in this case, the tasks tied to the stop were not complete, or that there was consent to extend the stop. See infra Part II.B.2 at 12.

additional step. Rather, Officer Santare described it as an informal practice that he usually followed, not as a requirement that he certainly would have adhered to on that occasion.

## 2. Justification for Extension of the Stop

Having found that the traffic stop was extended beyond the time it took to complete the underlying purpose of the stop, the court must now decide whether there was some independent justification for the extension, specifically, reasonable suspicion of additional criminal activity or the Defendant's consent to search. See United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011) ("If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent."). The body camera video and Officer Santare's testimony make clear that there was no reasonable suspicion of additional criminal activity by the time Officer Santare began talking about guns. While the initial confusion over the Defendant's identification documents understandably raised some suspicion that the Defendant was intentionally concealing his identity, that suspicion was dispelled when the Defendant explained that he had changed his name. Throughout the traffic stop, the Defendant was courteous and cooperative, and Officer Santare testified that he had no particularized concerns about his safety. The Defendant's criminal history, while concerning, was

not enough to provide reasonable suspicion by itself. <u>United States v. Sprinkle</u>, 106 F.3d 613, 617 (4th Cir. 1997). In sum, there are no articulable facts in the record to establish reasonable suspicion of additional criminal activity at the time Officer Santare began talking about guns.[11]

The Government argues, however, that the extension was also justified because the Defendant verbally consented to a search of his person. ECF No. 48 at 2. As a threshold matter, the Defendant's verbal consent to search his person is not valid, if it occurred during an unlawful seizure. <u>See</u> <u>Royer</u>, 460 U.S. at 501 (finding that the Defendant's otherwise voluntary consent to search his luggage was "tainted by the illegality" of his unlawful seizure). Accordingly, the court must first determine whether the Defendant consented to the extension of the stop, before turning to whether he offered a valid verbal consent to the search of his person.

---

[11] The United States points to five different facts supporting reasonable suspicion to extend the stop: (1) neither the Defendant nor the passenger were licensed to drive; (2) the Defendant's extensive criminal history and reported gang membership; (3) the name discrepancy; (4) that both the Defendant and the passenger appeared nervous; and (5) that the passenger said she was on probation for a drug offense. ECF No. 40 at 9. As discussed above, the first fact was not pursued by Officer Santare; the second and fifth facts refer to the individuals' criminal records and do not support reasonable suspicion by themselves; and the third fact was resolved by the time the topic turned to guns. The fourth fact is somewhat contradicted by the body camera video and Officer Santare's testimony. More importantly, these facts do not relate to any specific and articulable criminal activity. <u>See, e.g.</u>, <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (stating that reasonable suspicion must be that "criminal activity is afoot").

In determining whether unrelated post-stop questioning was consensual, the court must decide whether a reasonable person would have felt free to leave. See Florida v. Bostick, 501 U.S. 429, 434 (1991). Factors that are relevant to this inquiry include whether the officer handed back the driver's license and registration and whether the officer told the driver he was free to go. See Johnson, 555 U.S. at 333; United States v. LeCraft, 645 F. App'x 252, 255 (4th Cir. 2016). But see Ohio v. Robinette, 519 U.S. 33, 39-40 (1996) (rejecting a per se rule that an officer must always inform the defendant he or she is free to go in order for consent to be voluntary). If a reasonable driver would have felt free to disregard the officer "and go about his business," then there was no longer a seizure, and any extension of the encounter was consensual. Bostick, 501 U.S. at 434. Otherwise, the encounter remains a seizure requiring further reasonable suspicion or other justification, even if the defendant cooperates with the officer. See United States v. Guerrero Espinoza, 462 F.3d 1302, 1310 (10th Cir. 2006) (finding that the defendant's decision to answer the officer's questions did not constitute consent to prolong the stop, but rather was a product of his unlawful detention).

Here, the seizure clearly had not yet ended by the time Officer Santare questioned the Defendant about guns. Officer Santare did none of the things that usually signal to a driver that the stop was over: he did not return the Defendant's

identification card or registration, and he did not tell the Defendant he was free to go. Moreover, his line of questioning was pointed and insistent, was emphasized by a reference to "the bosses," and occurred while a second officer was speaking with the passenger and two other officers were standing in close proximity to the car. A reasonable defendant would not have thought that he was free to ignore Officer Santare's questions, much less to leave the scene. Accordingly, the court finds that the Defendant did not consent to the extension of the stop, and therefore that the extension to further question him about weapons and search his person was unlawful.[12] Because the search of the Defendant's person occurred during this unlawful seizure, the evidence produced during that search was a "direct result of an

---

[12] Cf. United States v. Williams, 808 F.3d 238, 245-46 (4th Cir. 2015) (finding that, under Rodriguez, even a "de minimis" extension "after completion" of the stop is unlawful without reasonable suspicion or the driver's consent). There was no reasonable suspicion here to justify the extension of the stop. See supra Part II.B.2 at 11-12. Moreover, the Defendant's verbal consent to search his person was invalid, because it was tainted by the illegal detention, see Royer, 460 U.S. at 501, and was therefore coerced. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) (setting forth a "totality of the circumstances" test for whether a consent search was the product of express or implied coercion). As discussed in text, supra Part II.B.2 at 13-14, the verbal consent to search occurred during the unlawful extension of the stop, and the Defendant did not consent to that extension or feel free to leave, so the verbal consent to search is invalid as a matter of law.

unconstitutional . . . seizure" and must be excluded. Segura v. United States, 468 U.S. 796, 804 (1984).

## C. Search of the Car

At the hearing and in its briefing, the United States pointed to three facts establishing probable cause to conduct a warrantless search of the car under the automobile exception:[13] the suspected heroin and large quantity of cash found during the search of the Defendant's person, the Defendant's resistance after the suspected heroin was discovered, and the passenger's statements[14] that there were drugs in the car. ECF No. 40 at 9-10. Each of these facts occurred after, and as a result of, the unlawful extension of the

---

[13] In addition to its argument that there was probable cause to search the car, the United States also raised the inevitable discovery doctrine, on the theory that the Norfolk Police Department would have impounded the car and conducted an inventory search. Response at 11; see Nix v. Williams, 467 U.S. 431, 444 (1984) (articulating the inevitable discovery rule). The record does not show that the evidence would have been inevitably discovered in this case, however. Officer Santare testified that he would have permitted the Defendant to leave the car at the scene or somewhere else in the vicinity, if the stop had resolved in a warning or ticket. Officer Santare did say the Norfolk Police Department would have impounded the car if he arrested the Defendant, but, as noted above, the arrest was the fruit of an unlawful seizure and search. See supra Part II.B.2 at 13-15; see also supra note 2 (testimony that a driver may just get a "warning out of the gate").

[14] The court notes that the United States provided little evidence or argument on the passenger's reliability or basis of knowledge. See, e.g., Illinois v. Gates, 462 U.S. 213, 230 (1983). In fact, at least one of the locations that the passenger pointed to as containing drugs, the space behind the car's radio, had no drugs at all. See supra note 5.

15

stop and unlawful search of the Defendant's person. Accordingly, the court finds that the taint arising from that unlawful seizure and search extends to the evidence found during the search of the car. See Segura, 468 U.S. at 804 (explaining that the exclusionary rule extends to indirect evidence of unconstitutional conduct).

### III. Conclusion

While the initial traffic stop in this case was lawful, Officer Santare's discussion of guns, questioning about weapons, and finally his request for consent to search the Defendant's person and then the car occurred after the "tasks related to the traffic infraction" were completed. Rodriguez, 135 S. Ct. at 1614. The Defendant was still seized at this time, because a reasonable person would not have felt free to leave, but there was no independent reasonable suspicion or valid consent justifying the seizure. As a result, the court finds that the period of questioning at issue, as well as the Defendant's consent to search his person, occurred during an unlawful seizure. Accordingly, the evidence produced from the search of the Defendant's person should be suppressed. United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992) ("If the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the fruit of the poisonous tree doctrine."). Because the search of the car was a fruit of the unlawful search of the Defendant's person as well as the unlawful extension of the

traffic stop, the evidence found during the search of the car should also be excluded. Segura, 468 U.S. at 804. The Defendant's Motion, ECF No. 38, is **GRANTED**. The evidence seized during the traffic stop from the searches of the Defendant's person and the car is **SUPPRESSED**.

The Clerk is **DIRECTED** to forward a copy of this Opinion to counsel for the Defendant and the United States Attorney.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Senior United States District Judge

Rebecca Beach Smith
Senior United States District Judge

April 3, 2020